UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,<br><br>*Defendant.* | Civil Action No. 17-1902 (RDM) |

## MEMORANDUM OPINION

Plaintiff Northrop Grumman Systems Corporation ("Northrop Grumman") brings this reverse-Freedom of Information Act suit against Defendant National Aeronautics and Space Administration ("NASA"). Northrop Grumman challenges as arbitrary and capricious and contrary to law, *see* 5 U.S.C. § 702, NASA's decision to release, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, two tables included in Northrop Grumman's contract with NASA for the design and manufacture of the James Webb Space Telescope. The case is presently before the Court on NASA's motion for summary judgment, Dkt. 27, and Northrop Grumman's cross-motion for summary judgment, Dkt. 28. For the reasons explained below, the Court will deny NASA's motion for summary judgment and will grant Northrop Grumman's cross-motion.

## I. BACKGROUND

### A. Contract NAS5-02200 & Clause B.7

Northrop Grumman Aerospace Systems ("NGAS"), the largest of Northrop Grumman's business sectors, "designs and manufactures a . . . range of military aircraft, autonomous

systems, and space technologies." Dkt. 28-1 at 9–10 n.1. In October of 2002, NGAS was awarded NASA Contract NAS5-02200, *see* Dkt. 18-1 at 4, to design and manufacture the James Webb Space Telescope ("JWST"), a "$9[] [billion] Program of international significance," Dkt. 18-7 at 97 n.6.[1] The JWST contract was structured as a "cost reimbursement contract" under which NASA agreed to pay Northrop Grumman's costs of performance plus a fee. Dkt. 28-1 at 11–12 (citing 48 C.F.R. §§ 16.301-1, 16.304–16.307). Under such a cost-plus contract, the government agrees to reimburse the contractor for its "direct costs," such as materials for construction and employee wages, and its "indirect costs," including a portion of overhead costs applicable to multiple contracts or to the company as a whole. *Id.* at 12. To allocate indirect costs, the JWST proposal and contract used a proposed "wrap rate" comprised of "three indirect cost components," *id.*: "related payroll expense," "overhead," and "general & administrative expense," which were projected for each year of the contract, Dkt. 18-1 at 17. Northrop Grumman was then required to "apply [the] proposed yearly Wrap Rates to [its] actual yearly" labor costs "to determine yearly costs based on the proposed Wrap Rates." *Id.* "Upon the completion of each calendar year," Northrop Grumman was further required to determine it "actual yearly Wrap Rates." *Id.* Because the actual rates are audited by the Defense Contract Audit Agency or another government auditor, the actual rate calculation can lag years behind the relevant contract year. *See* Oral Arg. Tr. at 18 (Rough). As a result, the company bills NASA using the proposed wrap rates until the actual rates are calculated. *Id.* If the actual rate ultimately deviated from the proposed rate by an agreed upon amount, however, Northrop Grumman could have been required to reimburse NASA for the difference over the allowable

---

[1] The contract was initially awarded to TRW, Inc., Dkt. 18-1 at 4, which was subsequently acquired by Northrop Grumman.

amount and, under some circumstances, to pay an additional penalty. *See id.* at 18–20, 50 (reflecting the parties' agreement regarding reimbursement and penalties).

Northrop Grumman's proposed wrap rates are identified in Table 1 to Clause B.7 of the JWST contract, and Table 2 to Clause B.7 provides examples of how the "negative fee incentive" would be calculated if Northrop Grumman's actual wrap rate deviated by the agreed-upon amount from its proposed wrap rate. *See* Dkt. 18-1 at 17–18. As NASA explained in its Final Decision, Clause B.7 was included "to reduce potential indirect rate creep" over the course of a long-term contract. Dkt. 18-7 at 97.

**B.  Administrative Action**

On February 10, 2017, NASA received a FOIA request from FOIA Group, Inc., a commercial service that submits FOIA requests on behalf of third parties. *See* Dkt. 18-1 at 2. The request sought a copy of the JWST contract with attachments, any modifications from 2004 to 2009, the "source selection statement," and the "[c]omplete[d]" Request for Proposals. *Id.*; Dkt. 18-7 at 94. The requestor later modified its request to exclude the Request for Proposals. *Id.* at 87, 89.

By letter dated March 24, 2017, NASA notified Northrop Grumman that it had received the FOIA request and requested that Northrop Grumman "provide [NASA] with a written response stating any objections Northrop Grumman . . . may have to the release of the requested documents." Dkt. 18-3 at 352. The letter further requested that Northrop Grumman "highlight" its objections on copies of the requested documents, which NASA provided along with its letter, and that it "provide the legal basis for those objections." *Id.* To the extent Northrop Grumman's objections were based on confidentiality, NASA asked that the company "give a detailed explanation as to how the release of the requested information would cause substantial harm to

3

[the] company." *Id.* Due to its statutorily-imposed deadline for responding to the FOIA request, NASA urged Northrop Grumman to respond by April 4, 2017. *Id.*

After receiving a three-day extension of time, Northrop Grumman submitted its letter response on April 7, 2017, along with over a thousand pages of attachments. *See* Dkt. 18-3 at 360–491, Dkt. 18-4, Dkt. 18-5, Dkt. 18-6, Dkt. 18-7 at 1–76. In its letter, Northrop Grumman objected to the disclosure of a number of portions of the contract, most of which are not at issue in this case. *See* Dkt. 18-3 at 361–70. As relevant here, Northrop Grumman objected to the disclosure of the two tables found on pages 14 and 15 of Clause B.7 of the contract. Dkt. 18-3 at 370. Specifically, it objected "to the release of its [proposed] wrap rates for 2002 through 2009 and the calculation of the negative fee incentive," which appear in those tables, on the ground that this information is "confidential" and thus exempt from disclosure under Exemption (b)(4) of FOIA. *Id.* at 363–64, 370. The company explained that the wrap rates disclosed in the contract ███████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* at 370. Those rates, moreover, "are closely held within" Northrop Grumman, are "considered proprietary," and are "not shared with competitors." *Id.* "By knowing [Northrop Grumman's] wrap rates," the company continued, "competitors could use the information to ensure that they bid less than [Northrop Grumman] on competitive proposals [including several identified in Northrop Grumman's letter], thereby jeopardizing [the company's] chances of winning new business." *Id.* at 370. Northrop Grumman concluded by stressing that "release of the wrap rates . . . and the calculation of the negative fee incentive for indirect rates . . . under the FOIA would cause [the company] substantial competitive harm." *Id.* at 370–71.

4

Four months later, on August 30, 2017, NASA informed Northrop Grumman that, "[f]ollowing detailed discussions with financial and procurement personnel familiar with this clause and the history of the Contract," NASA had decided to disclose the company's proposed wrap rates and negative fee incentive calculation. Dkt. 18-7 at 97. NASA gave six main reasons for that conclusion: *First*, it concluded that Northrop Grumman would not suffer competitive harm because the tables included in Clause B.7 merely disclosed the company's projected wrap rates, not its actual wrap rates. *Id. Second*, NASA reasoned that, "because the calculation [of the negative fee incentive] was shown only through 2009, and ███████████████ ███████████ it is highly unlikely that a competitor could" use the information contained in the tables to "extrapolate . . . what [Northrop Grumman's] actual rates were through 2009, or [to determine] how they might be applied to future procurements with very different requirements." *Id. Third*, ███████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████ *Id. Fourth*, NASA reasoned that because the JWST contract was a "once in a generation" contract with "no follow-on" contract, and any future contract for a space-based observatory "will contain different requirements," "it is . . . unlikely that competitors could simply incorporate obsolete [Northrop Grumman] wrap rate information contained herein to gain a definitive advantage needed to secure a contract for a related space-based infrared observatory, or other Federal procurement, of this magnitude." *Id.* at 97 n.6. *Fifth*, it explained that, for any future contract, "[c]ompetition is likely to be based on a variety of factors including cost, past performance, and technical capability" so the wrap rate information "is only one aspect of a myriad number of fluctuating variables relevant to a future contract award." *Id.* at 96–97 n.6.

5

*Sixth*, NASA observed that, ████████████████████████████████ ████████████████████████████ the tables "do[] not contain any of [Northrop Grumman's] actual information from the current time period." *Id.* at 97.

For all of these reasons, NASA concluded that Northrop Grumman "ha[d] not demonstrated . . . that release of this information is likely to cause substantial competitive harm to" the company and that, accordingly, the "information is releasable under FOIA." *Id.* at 98 (citing *Boeing v. Dep't of the Air Force*, 616 F. Supp. 2d 40 (D.D.C. 2009)). Finally, NASA informed Northrop Grumman that its decision "constitute[d] * FINAL AGENCY ACTION * with respect to [the] matter" and that "further comments [would] not be considered." *Id.* at 106.

Northrop Grumman wrote to NASA two weeks later—the day before it filed this suit—expressing alarm about "the prospective release of information related to" the JWST contract "that could harm the [c]ompany's ability to compete fairly for future contracts, not only with NASA but with many other government agencies." Dkt. 20-3 at 2. It, accordingly, asked that NASA reconsider its "incorrect analysis," which was based on "erroneous factual assumptions," "with respect to a single area of information"—the company's proposed "wrap rates." Dkt. 20-3 at 2. Northrop Grumman argued that ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ *Id.* at 3, 8, 10–11. Northrop Grumman further explained that it and its competitors go to great lengths to divine what others are likely to bid on competitive contracts and that knowing or accurately predicting what proposed wrap rates others will use would provide a competitive advantage. *Id.* at 7–8. Finally, Northrop Grumman argued that disclosure

6

of the proposed wrap rates it included in Clause B.7 would permit its competitors to infer what the company's actual wrap rates were and thus to gain additional insight into its confidential pricing information. *Id.* at 6. Because it had already issued a "final" decision, NASA did not respond to Northrop Grumman's letter.

**C.     Procedural History**

On September 15, 2017, Northrop Grumman filed this reverse-FOIA action, Dkt. 1, and, that same day, moved for a temporary restraining order and/or preliminary injunction, Dkt. 4. In response, NASA agreed to delay releasing the disputed records while this litigation is pending, and, with the agreement of the parties, Dkt. 25; Dkt. 26, the Court denied the motion for a preliminary injunction as moot, *see* Minute Order (Nov. 21, 2017). Northrop Grumman then filed a motion for leave to supplement the administrative record or, in the alternative, to introduce extra-record evidence, requesting that the Court consider, among other things, its September 14, 2017 request that NASA reconsider its decision. Dkt. 20. After hearing argument on the motion, the Court denied Northrop Grumman's motion to supplement the administrative record, denied the company's motion to introduce extra-record evidence as premature, but granted it leave to reassert the latter request in the course of briefing the parties' cross-motions for summary judgment. Dkt. 30 at 14. The parties' cross-motions for summary judgment, including Northrop Grumman's request to introduce extra-record evidence, are now before the Court. Dkt. 27; Dkt. 28.

## II. ANALYSIS

FOIA is a disclosure statute, which mandates that federal agencies release "agency records" upon request unless the records at issue are covered by one of nine "exclusive" exemptions. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973)). In mandating disclosure of non-exempt records, moreover, "Congress did not

limit an agency's discretion to disclose [even exempt] information;" as a result, FOIA "does not afford" those who have provided information—including sensitive business information—to the government "any right to enjoin agency disclosure." *Chrysler Corp. v. Brown*, 441 U.S. 281, 294 (1979). The absence of such a remedy under FOIA, however, does not end the matter because another statute, the Trade Secrets Act, 18 U.S.C. § 1905, prohibits "officer[s] or employee[s] of the United States or of any department or agency thereof" from disclosing certain proprietary information "to any extent not authorized by law." *Id.* And, although the Trade Secrets Act does not create "a private right of action to enjoin disclosures in violation of the statute," *Chrysler Corp.*, 441 U.S. at 316–17, the Administrative Procedure Act ("APA") authorizes an "aggrieved" person to seek judicial review of an unlawful or arbitrary and capricious "agency action," 5 U.S.C. §§ 702, 706(2)(A). Accordingly, an aggrieved party may bring an action under the APA to enjoin an agency from releasing proprietary information under FOIA in violation of the Trade Secrets Act. *Chrysler Corp.*, 441 U.S. at 318.

At this point in the analysis, FOIA and the Trade Secrets Act—at least for relevant purposes—converge. Under Exemption 4 of FOIA, an agency is *not required to* disclose "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4), and under the Trade Secrets Act, an agency *may not* disclose "trade secrets" unless "authorized by law" to do so, 18 U.S.C. § 1905. Because the Trade Secrets "Act is at least co-extensive with . . . Exemption 4 of FOIA," *CAN Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987), it "effectively prohibits an agency from releasing information subject to th[at] exemption," *McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182, 1186 (D.C. Cir. 2004) ("*McDonnell Douglas II*"). *See also McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995) ("[W]henever a party succeeds

8

in demonstrating that its materials fall within Exemption 4, the government is precluded from releasing the information by virtue of the Trade Secrets Act."). Information falls within Exemption 4, in turn, when it is "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 766 (D.C. Cir. 1974). Only the third prong—whether the information to be released is "privileged or confidential"—is contested in this case.

A.  **Governing Standard**

The standard for determining whether information is "privileged or confidential" varies based on whether the information was submitted to the government voluntarily or involuntarily. If information is disclosed to the government voluntarily, a reverse-FOIA plaintiff need only show that the information is of the type that the plaintiff "would customarily not . . . release[] to the public." *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 304–05 (D.C. Cir. 1999) ("*McDonnell Douglas I*") (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992)). In contrast, "[i]f the information was required, . . . it will be considered confidential only if disclosure would be likely either (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 305; *see also Critical Mass Energy Project*, 975 F.2d at 878; *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770. In reverse-FOIA cases involving pricing information, decisions in this district typically apply the latter standard, reasoning that "[t]he federal government is required by law to consider price when it decides which competitor should be awarded a contract, FAR § 15.304(c)(1)," and thus the information constitutes "a required element of government solicitations, and hence involuntarily submitted." *Can. Commercial Corp. v. Dep't of the Air*

9

*Force*, 442 F. Supp. 2d 15, 29 (D.D.C. 2006); *see also Martin Marietta Corp. v. Dalton*, 974 F. Supp. 37, 39 (D.D.C. 1997); *but see Cortez III Serv. Corp. v. NASA*, 921 F. Supp. 8, 12–13 (D.D.C. 1996) (concluding that some of the information submitted as part of a bid was not "required"). Because the Court concludes that NASA's decision to release the information contained in the two tables at issue must be set aside under either standard, the Court need not decide whether the less stringent standard for voluntarily disclosed information applies.

To demonstrate that disclosure would "cause substantial harm to [its] competitive position," a reverse-FOIA plaintiff is not required to "demonstrate 'with certainty'" that "release of the contested information could cause [it to suffer such] harm." *McDonnell Douglas II*, 375 F.3d at 1187; *see also Boeing*, 616 F. Supp. 2d at 45. "Actual competition and the likelihood of substantial competitive injury is all that need be shown." *Gulf & W. Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979). Release of requested information may cause substantial competitive harm if disclosure would "allow competitors to estimate, and undercut, [the plaintiff's] bids." *Id.* Pricing information is not categorically shielded from disclosure under Exemption 4, however; rather, "each case must be evaluated independently to determine whether the particular information at issue could cause substantial competitive harm if it were released." *Boeing*, 616 F. Supp. 2d at 45; *see also Can. Commercial Corp. v. Dep't of the Air Force*, 514 F.3d 37, 40 (D.C. Cir. 2008) ("Pricing information . . . falls within Exemption 4 . . . if its disclosure would . . . 'cause substantial harm to the competitive position of the person from whom the information was obtained.'" (citation omitted)). "[U]nascertainable" or "fluctuating . . . variables" may, of course, prevent competitors from using "constituent pricing information" "to model exactly or to pinpoint precisely a rival's pricing strategy, but pinpoint precision is not required to inflict substantial competitive harm." *McDonnell Douglas II*, 375 F.3d at 1192–93

(internal quotation marks and citations omitted). Agencies—and ultimately courts—must, accordingly, consider the nature of the pricing information in light of the particular facts and context presented and must decide whether disclosure is "likely" to cause "substantial competitive harm" to the plaintiff. *See Boeing*, 616 F. Supp. 2d at 47–48.

**B.     Application of the Standard**

Except in "unusual circumstances," *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008), judicial review under the APA is "based on the full administrative record that was before the [agency] at the time [it] made [its] decision," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), and the court "should have before it neither more nor less information than did the agency when it made its decision," *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). According to Northrop Grumman, this is one of those rare cases in which the Court may consider extra-record evidence because it was denied a fair and complete opportunity to present its arguments and facts to NASA. Dkt. 28-1 at 37–41. Because the Court concludes on the basis of the existing administrative record and the parties' agreed-upon description of relevant background information that NASA's decision to release the information contained in Clause B.7 is arbitrary and capricious, it need not reach this issue. The Court will therefore review each of NASA's asserted rationales without considering Northrop Grumman's extra-record evidence.

NASA's first two reasons for concluding that disclosure of Northrop Grumman's proposed wrap rates would not cause the company substantial competitive harm—that Northrop Grumman's "actual rates" are not being disclosed, and that the actual rates cannot be derived from the release of the proposed wrap rates—are flawed for two reasons. First, although the wrap rates contained in Clause B.7 are, indeed, *proposed* rates and are not based on the *actual* indirect costs Northrop Grumman incurred in performing under the JWST contract, they are by

11

no means unconnected to Northrop Grumman's actual rates. As explained above, the JWST contract was a cost-plus contract and, to control indirect costs, it included a "negative fee incentive" for the first eight years of the period of performance. Dkt. 18-1 at 16; *see also* Dkt. 18-7 at 97. At the end of each calendar year, Northrop Grumman was required to apply its proposed wrap rate to its actual labor costs to determine its yearly costs based on the proposed wrap rate. Dkt. 18-1 at 17. For each of the first eight years of the contract, Northrop Grumman would then add this amount to the amount calculated in the prior performance years using the same methodology, and would add three percent to the cumulative "proposed wrap rate" cost to arrive at a "cumulative cost cap." *Id.* at 17–18. Later, Northrop Grumman would apply its actual wrap rate—which was based on its actual indirect costs—to its labor costs to arrive at its actual yearly costs, which it then added to the amount calculated for prior performance years using that same methodology. *Id.* Finally, for each performance year, the company was required to subtract its cumulative "actual wrap rate" cost from its cumulative, adjusted "proposed wrap rate" cost to calculate the "negative fee incentive." *Id.* at 18. Accordingly, to avoid the "negative fee incentive," Northrop Grumman needed to ensure that its proposed wrap rate was predictive of its actual wrap rate. And, as Northrop Grumman explained in its April 7, 2017 submission to NASA, "[b]ecause the wrap rates" included in Clause B.7 therefore "reveal [the company's] cost of doing business, they can be used by competitors to gain an unfair competitive advantage when bidding on competitive contracts against [Northrop Grumman]." Dkt. 18-3 at 370 (explaining that "competitors would know" Northrop Grumman's "indirect expenses applicable to each dollar of labor").

Second, even if competitors are not able to "extrapolate" Northrop Grumman's "actual rates," Dkt. 18-1 at 97, the proposed wrap rates are themselves "proprietary information" that

Northrop Grumman treats as "closely held" and does "not share[] with competitors," Dkt. 18-3 at 370. Because the actual rates are unknown at the time of contracting, the proposed wrap rates are one means by which the government evaluates the bidder's proposed costs. As Northrop Grumman explained in its April 7, 2017 submission, moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ thus making them a potentially valuable tool for a competitor who is seeking to "calculate [Northrop Grumman's] future bids and its pricing structure from the withheld information," thereby "allow[ing] competitors to estimate, and undercut, its bids." *Gulf & W. Indus.*, 615 F.2d at 530.

Accordingly, because disclosure of Northrop Grumman's proposed wrap rates would permit competitors to undercut Northrop Grumman's bids, NASA's first two rationales for releasing them do not withstand APA scrutiny.

NASA's third rationale—that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 18-7 at 97—is equally flawed. The significance of the proposed wrap rates is the role they play at the time of contracting. To be sure, a competitor might be interested to know whether Northrop Grumman's actual wrap rates triggered the negative fee incentive. That information, for example, might let Northrop Grumman's competitors infer how Northrop Grumman might change its proposed wrap rates in future bids. But the absence of that additional information does not deprive the proposed wrap rates that Northrop Grumman used—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 18-3 at 370—of trade secret status. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Fourth, NASA reasoned that because the JWST project was a unique, "once in a generation" contract, it was "unlikely" that any Northrop Grumman competitor could use the JWST proposed wrap rate "to gain a definitive advantage needed to secure a contract for a related space-based infrared observatory, or other Federal procurement of this magnitude." Dkt. 18-7 at 97 n.6. That conclusion, however, failed to consider Northrop Grumman's submission stating that release of the JWST proposed wrap rates would put Northrop Grumman at a competitive disadvantage in bidding on a range of specific aerospace solicitations. *See* Dkt. 18-3 at 371–72. Northrop Grumman supported that assertion with numerous specific examples, including ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 371. The company further explained that, "given the multiple programs and opportunities that are on the horizon," "[t]he threat of competitive harm is not illusory but rather distinct and real." *Id.* at 372. Because NASA failed to consider these likely competitive harms, its rationale—once again—fails APA scrutiny.

Fifth, NASA posited that the release of the proposed wrap rates would not cause competitive harm because competition for future contracts "is likely to be based on a variety of factors including cost, past performance, and technical capability," and the wrap rate information "is only one aspect of a myriad number of fluctuating variables relevant to a future contract award." Dkt. 18-7 at 97–98 n.6. This argument is similar to the reasoning the D.C. Circuit rejected in *McDonnell Douglas I*, where the defendant—NASA in that case as well—argued that "underbidding due to the disclosure would not occur because price is only one of the many factors used by the government in awarding contracts." 180 F.3d at 306. The D.C. Circuit wrote

14

"[t]hat response seems too silly to do other than to state it, and pass on." *Id.* As the D.C. Circuit further explained in *McDonnell Douglas II*:

> Because price is the only objective, or at least readily quantified, criterion among the six criteria for awarding government contracts, submitting the lowest price is surely the most straightforward way for a competitor to show its bid is superior. Indeed, price is by statute the only factor that "must be considered in the evaluation of a proposal."

375 F.3d at 1189 (quoting 10 U.S.C. § 2305(a)(3)(A)(ii)). Here, Northrop Grumman's proposed wrap rates were an important component of "price" under the JWST cost-plus contract. Release of that information "would likely cause [Northrop Grumman] substantial competitive harm because it would significantly increase the probability [its] competitors would underbid it in" future contracts. *Id.*

Sixth, NASA reasoned that the proposed wrap rates would not cause competitive harm because they "were inserted at Contract formation in 2002, and never updated" and were therefore not "current." Dkt. 18-7 at 97. As NASA further explains in its brief, "[b]ecause Clause B.7 was never updated or changed, the last piece of information at issue is data projected in 2002 for the year 2009," Dkt. 27 at 26, and, because Northrop Grumman's proposed wrap rates for the years ████████████████ "competitors would have to make broad assumptions that ████████████████ would continue in the same manner nearly 10 years later," *id.* The Court agrees, of course, that release of the JWST proposed wrap rates would likely cause Northrop Grumman competitive harm only if that information would help—or would likely help—the company's competitors to underbid it in future solicitations. *See Boeing*, 616 F. Supp. 2d at 47 ("[T]he critical question is whether some logical, consistent pattern exists that would permit extrapolation by a competitor."). But, on the present record, there is no reason to doubt Northrop Grumman's assertion that just such a risk

15

exists here—and, more importantly, NASA did not offer any reasoned basis for rejecting the company's representations. Northrop Grumman told NASA that  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Dkt. 18-3 at 370. That contention, moreover, finds support in Clause B.7 itself, which shows that ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ *See* Dkt. 18-2 at 17–18. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ a plaintiff need not demonstrate "that the release of information would allow a competitor to 'model exactly or to pinpoint precisely' information that would cause substantial harm." *Boeing*, 616 F. Supp. 2d at 48 (quoting *McDonnell Douglas II*, 375 F.3d at 1193)).

According to NASA, the *Boeing* case supports its conclusion that the "age and unpredictability" of the JWST proposed wrap rates diminishes any risk of competitive harm to Northrop Grumman. Dkt. 27 at 9–11; Dkt. 18-7 at 98. But the "wrap rates" at issue in the *Boeing* case differ from those at issue here in a dispositive respect: the JWST wrap rates were simply a measure of indirect costs, while the wrap rates at issue in *Boeing* included both indirect costs *and* direct costs such as "labor rates," 616 F. Supp. at 43, 48. As a result, the rates at issue in *Boeing* "fluxuat[ed] from year to year [and did] not follow a discernable pattern," 616 F. Supp. at 48. To the extent that NASA suggests that *Boeing* supports a *per se* rule that the release of wrap rates can never meet the substantial competitive harm requirement for FOIA Exemption 4, that argument is untenable. *See McDonnell Douglas II*, 375 F.3d at 1192; *Can. Commercial Corp.*, 514 F.3d at 40. And, to the extent it contends that the JWST wrap rates were subject to

the same type of variation as those at issue in *Boeing*, that contention is neither explained nor consistent with the record.

Because the reasons NASA gave for concluding that release of the information found in Clause B.7 was not likely to cause Northrop Grumman substantial competitive harm do not withstand scrutiny, its decision must be set aside as arbitrary, capricious and not in accordance with the law. *See* 5 U.S.C. § 706(2)(A).

## CONCLUSION

For the reasons set forth above, the Court will deny NASA's motion for summary judgment, Dkt. 27, and will grant Northrop Grumman's cross-motion for summary judgment, Dkt. 28.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 18, 2018